UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANNIFER MONTGOMERY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, et al., <br><br> Defendants. | No. 22 CV 3697 <br><br> Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

On December 4, 2020, at around 1:30 p.m., a shooting took place in Chicago, approximately where the eastbound I-290 turns into Ida B. Wells Drive. The City of Chicago's Office of Emergency Communications reported a white SUV fleeing the scene. More than 15 minutes later and a few miles away on Lake Shore Drive, two Chicago police officers pulled over Jannifer and Michael Montgomery and their two young children ("the Montgomerys") in connection with the shooting. The Montgomerys were driving a dark grey sedan. After two more officers arrived as backup, Chicago police conducted a "felony stop" of the Montgomerys' vehicle. The officers drew their weapons, forced the adult Montgomerys to walk backwards out of their car, and handcuffed them. The Montgomerys, however, had nothing do with the shooting, and after realizing their mistake, the officers let them go.

The Montgomerys sued the police officers involved in the stop and the City of Chicago under the Fourth and Fourteenth Amendments of the United States Constitution, claiming the stop and searches of their car and the searches of the adult

Montgomerys' bodies were unlawful and that the officers used excessive force. *See* 42 U.S.C. § 1983. Defendants have moved for summary judgment on all claims, arguing the officers' behavior was reasonable as a matter of law and that, even if not, they are protected by the doctrine of qualified immunity. [39]

The Court grants defendants' summary judgment motion in part and denies it in part.

I.  **Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

II. **Background**

On December 4, 2020, the city's Office of Emergency Communications ("dispatch") reported a shooting on the eastbound I-290 near Canal Street. [52] ¶ 10. Dispatch provided a description of the shooter as "a male, black, wearing a black face mask. He was driving a white SUV." [64] ¶ 6; [53-1] at 4:1–2. Dispatch later repeated the description of the shooter's vehicle as a "white SUV." [53-1] at 5:4. Ryan Gubricky, then a field training officer with the Chicago Police Department ("CPD"), was in a

2

police van with Ryan Anderson, then a CPD probationary police officer, when they heard dispatch's report of the shooting. [52] ¶ 12. Gubricky asked dispatch for a description of the shooter's vehicle and was again told that it was a "white SUV." [64] ¶ 10; [53-1] at 6:10–17. Later, dispatch gave another description based on an eyewitness report of a "white sedan Impala," "last seen eastbound Ida B. Wells," "with the front driver and [both] rear tires blown out." [53-1] at 11:13–16.

Around the time of the shooting, Jannifer and Michael Montgomery were driving their children, ages one and four, from suburban River Forest, Illinois, to a playground in Chicago's Kenwood neighborhood in a dark grey 2014 Nissan Altima sedan. [64] ¶¶ 1–2. At some point—the parties dispute exactly when—Gubricky and Anderson saw the Montgomerys' Nissan and began to follow it. [52] ¶ 19. Gubricky asked dispatch: "Squad, did anybody say anything about a blue or gray Nissan? We got one that's pretty banged up southbound on Lakeshore Drive at 18th. It's occupied like multiple times." [64] ¶ 12; [53-1] at 12:9–12. Dispatch responded: "I don't recall reading anything like that. ... I got a white sedan, white SUV, and now this tan Toyota [SUV]." [64] ¶ 12; [53-1] at 12:2–15. At no point did dispatch report that a Nissan or a grey sedan was involved in the shooting. [64] ¶ 24.

While driving behind the Nissan, Gubricky gave dispatch its license plate number and was told that the Montgomerys' license plate registration was expired. [52] ¶ 20; [53-1] at 12:20. Gubricky then told dispatch: "I'll be pulling this car over at 31st and Lake Shore Drive." [52] ¶ 21; [53-1] at 12:20. Gubricky activated his CPD vehicle's emergency lights and sirens on southbound Lake Shore Drive somewhere

3

around 31st Street. [52] ¶ 21. At this point, the Nissan was in the middle lane of Lake Shore Drive. [64] ¶ 4. Jannifer, who was driving, pulled the Nissan over at the next exit ramp off Lake Shore Drive, at Oakwood Boulevard. [52] ¶¶ 21, 27; [53-1] at 15:7–8. At her deposition, Jannifer testified that "there was nowhere safely for the police officer to pull over to get out of the car and stop me" before that exit ramp. [41-3] at 53:17–23. The parties dispute how far the exit ramp was after Gubricky activated his vehicle's lights and sirens: the Montgomerys say approximately four blocks, while Gubricky estimated about a mile. [52] ¶ 23; [64] ¶ 4.

Gubricky stopped several car lengths behind the Nissan and performed what defendants refer to as a "felony stop." [52] ¶¶ 28–30. Although defendants cite no source formally defining that term, the Court understands defendants to be referring to a stop that officers perform with the assumption that those being stopped may be armed, possess contraband, or have active arrest warrants. Gubricky pointed his weapon at the Nissan—with the Montgomerys still in it—and waited for backup. *Id.* ¶ 31.

Officers George Georgopalis and Christopher Monahan, the backup, arrived and assisted Gubricky with the stop, which involved pointing their firearms at the Nissan and having Michael and Jannifer Montgomery leave their Nissan one at a time, before placing them both in handcuffs and patting them down for weapons. *Id.*

4

¶¶ 32–33.[1] Georgopalis, Monahan, and Anderson all pointed their firearms at the Nissan during the stop, and Georgopalis used his vehicle loudspeaker to order the Montgomerys out of the car, but the parties agree that "[t]his was Gubricky's stop, and the other officers were assisting him." *Id.* ¶¶ 34, 44; [64] ¶ 17.

Within 20 minutes of stopping the Montgomerys, Gubricky determined that they were not, in fact, involved in the shooting, and the officers left. [52] ¶ 35. No tickets or citations were issued. [64] ¶ 26. Using his flashlight, Gubricky looked into the Nissan's window during the stop, and Monahan at one point leaned into its open front door.[2] [52] ¶¶ 64–65. The parties dispute to what extent the Nissan had rear-end damage, but defendants do not assert that any of its tires were damaged, nor do the tires appear damaged in any of the videos submitted as evidence. [64] ¶ 22.

## III. Analysis

The Montgomerys argue their rights under the Fourth and Fourteenth Amendments of the United States Constitution were violated by the vehicle stop. Specifically, they contend that the police had no justification for the traffic stop, that the defendant officers used excessive force by pointing their firearms at them and handcuffing the adult Montgomerys, that there was no justification to frisk either

---

[1] Defendants dispute that the officers pointed their weapons "at the Montgomerys" but, instead, say that they pointed their weapons "toward the Montgomerys' car." [64] ¶¶ 15, 17. Defendants do not explain why this difference matters, and for the purpose of evaluating the excessive force claim, the Court does not see a legally relevant distinction between pointing a gun at a person in a car and pointing a gun at a car with a person in it.

[2] While his subjective motivations are not relevant to the Fourth Amendment inquiry, defendants assert Monahan leaned into the Nissan to start the vehicle and activate its heat for the benefit of the youngest Montgomery child who remained in the back seat during throughout the family's encounter with the police. [52] ¶ 65; [41-8] at 13:53:06–13:54:36.

5

adult Montgomery, and that Gubricky and Monahan unlawfully searched the car during the stop. [1] ¶¶ 30–38; [55] at 7–11.

Defendants in return argue that their actions were reasonable under the Fourth Amendment, and that to the extent they were not, they are protected by the doctrine of qualified immunity. *See generally* [40]. Defendants also contend that, because neither child was handcuffed and "there is no evidence" that either child was aware that guns were pointed at the car, both children lack valid claims against the police officers. *Id.* at 14–15.

The Court addresses each of the defendants' arguments in turn.

**A.     Illegal Stop**

A vehicle stop is a seizure within the meaning of the Fourth Amendment, but that seizure is reasonable when police have probable cause to believe a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Probable cause exists when the facts available at the moment of the seizure would "warrant a man of reasonable caution in the belief that an offence had been committed." *See Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (quoting *Beck v. Ohio*, 379 U.S. 89, 96, (1964)).

The Montgomerys dispute that their license plate registration actually was expired, but they do not dispute that dispatch *told* Gubricky that the Nissan's vehicle registration was expired. [52] ¶ 20. They also concede that, whether or not their registration was actually expired, dispatch's statement provided a lawful reason for a traffic stop. [55] at 4 n.5. And, indeed, a dispatch report that a vehicle registration

6

was expired would warrant a reasonable belief that the vehicle registration was in fact expired and justify a traffic stop on that basis. *See United States v. Jackson*, 962 F.3d 353, 358–59 (7th Cir. 2020). The Montgomerys' illegal stop claim is therefore dismissed for all defendants.

## B. Excessive Force

The parties agree that Gubricky, Anderson, Monahan, and Georgopalis all pointed their guns at the Montgomerys' Nissan, but because Gubricky and Anderson arrived first at the scene and Gubricky directed the backup officers, Monahan and Georgopalis, after their arrival, the Fourth Amendment analysis is different for the two sets of officers.

### 1. Officers Gubricky and Anderson

Gubricky and Anderson are not entitled to summary judgment on the Montgomerys' claim that they used excessive force during the stop, nor are they entitled to qualified immunity.

#### a. Fourth Amendment Right

The Fourth Amendment protects citizens from unreasonable use of force by the police officers who stop or arrest them. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). This is an objective standard, evaluated from the perspective of a reasonable officer on the scene. *Id.* at 396–97. Reasonableness depends on "the facts and circumstances of each particular case," which include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Force is reasonable "only when exercised in proportion to the threat

7

posed," *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 729 (7th Cir. 2013) (cleaned up), and "officers may not use unnecessary force when a civilian is already subdued or compliant," *Taylor v. City of Milford*, 10 F.4th 800, 810 (7th Cir. 2021). Because of the "fact-intensive nature of the inquiry," the Seventh Circuit has instructed that summary judgment on excessive-force claims should be "granted sparingly." *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)).

There is a genuine dispute of material fact about whether Gubricky's and Anderson's decisions to point guns at the Montgomerys and handcuff them violated the Fourth Amendment. *See Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) ("[G]un pointing when an individual presents no danger is unreasonable and violates the Fourth Amendment."); *Cf. Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) (handcuffs may be permissible for officer safety in *Terry* stops but "that does not mean that law enforcement has carte blanche to handcuff routinely"). Defendants do not point to any authority suggesting that an expired vehicle registration by itself creates a reasonable fear of danger, so whether the gun-pointing and handcuffing was reasonable depends on whether it was reasonable for the officers to believe that the

8

Nissan had been involved in the shooting, or if something the Montgomerys did during the stop created a reasonable belief they were dangerous.[3]

Viewing the facts in the light most favorable to the Montgomerys and drawing all reasonable inferences in their favor as well, it was unreasonable for Gubricky and Anderson to believe the Nissan or its occupants had been involved in the shooting. The parties agree that none of the officers were told that a grey Nissan Altima was involved in the shooting—indeed, dispatch specifically told Gubricky that it did not recall any mention of a grey Nissan—and Jannifer Montgomery, the Nissan's driver, did not match dispatch's description of "a male black, wearing a black face mask." [52] ¶ 25; [64] ¶ 6. Defendants note that dispatch had reported "damage" to the offender's vehicle, but the only damage mentioned in the dispatch transcript are three "blown out" tires, *see* [53-1] at 11:13–16, and the Nissan had four intact tires during the stop. In other words, from the evidence presented, it is not clear what made the Montgomerys' Nissan more suspicious than any other vehicle on Lake Shore Drive.

Defendants concede that the Nissan did not match dispatch's description but argue that "[a]n imperfect match doesn't necessarily destroy reasonable suspicion." [65] at 3. To support this argument, defendants cite *Torry v. City of Chicago*, 932 F.3d 579, 588 (7th Cir. 2019)). But *Torry* is factually distinguishable—and readily so.

---

[3] Defendants appear to assume that the stop of the Montgomerys' Nissan was a so-called "*Terry* stop," *see Terry v. Ohio*, 392 U.S. 1 (1968), and was therefore justified by reasonable suspicion. *See, e.g.*, [40] at 7–8. But they also support their arguments by citing to cases involving the more demanding standard of probable cause. *Id.* at 8 (citing *McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002)). The Court does not need to resolve any ambiguity here, though, because it concludes that summary judgment is not warranted on plaintiffs' excessive force claim, as to Gubricky and Anderson, even under reasonable suspicion.

9

There, in connection with a shooting, police stopped three Black men in a grey *sedan*—even though the officers relied on a description that the shooting suspects were three Black men in a grey *SUV*. *Id.* at 587–88. The Seventh Circuit concluded the stop was reasonable because even though the plaintiffs may have been driving a different type of car, they at least matched the description in multiple other respects: number of men, their race, the car's color. *Id.* at 587. Here, by contrast, defendants heard dispatch describe a "white sedan size, like a [Chevrolet] Impala" with "its front driver's side and its front/rear passenger tires blown out." [53-1] at 11:10–15. Of the multiple, slightly varying descriptions of the car involved in the shooting that dispatch provided Gubricky and Anderson, this version is the one that comes closest to describing the Montgomerys' car. And yet the Montgomerys' car was still a different make and color, and it had all four of its wheels intact. Any match here was not merely "imperfect."

Moreover, although there may be some truth to defendants' position that "an imperfect match doesn't necessarily destroy reasonable suspicion," *see* [65] at 3, an imperfect match does not necessarily create reasonable suspicion either. If that were the case, defendants would have been equally justified in pulling over any sedan or SUV on Lake Shore Drive within a 15-minute window following the shooting. Such extraordinarily broad suspicion does not conform with the Fourth Amendment's requirement that officers have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Thus, viewed in the light most favorable to the Montgomerys,

10

dispatch's descriptions did not provide reasonable suspicion that the Montgomerys' Nissan or anyone in it was involved in the shooting that day.

Besides dispatch reports, the only other evidence given to justify Gubricky's suspicion that danger lurked within the Nissan is Gubricky's own deposition testimony that "in his experience," when a vehicle does not "pull over right away" it "suggests the occupants have weapons, have a warrant, or there is contraband." [52] ¶¶ 29–30; [41-4] at 62:2-18. To support Gubricky's experience, defendants rely particularly on *McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002). But the facts of *McNair* are sufficiently distinguished from the facts here that *McNair* does not control.

First, the officer-defendant in *McNair* had not himself pointed a gun at anyone; instead, he had radioed for backup when the plaintiffs' car did not stop promptly, which resulted in "an over-the-top response by the police department." *Id.* at 466 ("[T]he record ... shows that [the defendant] did no more than radio for backup."). But Gubricky and Anderson pointed guns themselves, and the Court does not understand the Montgomerys to be arguing either is constitutionally responsible for the actions of either Monahan or Georgopalis.

Another key difference is that, as the Seventh Circuit noted, the *McNair* stop was "after dark" and that "the neighborhood posed risks," which, combined with the delay in the plaintiffs' stopping, made calling for backup "a sensible decision." *Id.* at 465; *see also Baird*, 576 F.3d at 346 ("*McNair* involved 'a suspect in a rough neighborhood [who] refuse[d] to stop when directed,' which is a genuine source of police concern.") (quoting *McNair*, 279 F.3d at 467). But a jury might reasonably

11

conclude that a midday stop on Lake Shore Drive did not create the same air of danger as *McNair*'s nighttime stop in a "rough" neighborhood.

And, finally, while the *McNair* plaintiffs "persisted for almost another mile," before they stopped, *McNair*, 279 F.3d at 480 (Coffey, J., concurring in part and dissenting in part), the parties dispute the time and distance that elapsed between Gubricky turning on his lights and siren and Jannifer Montgomery pulling the Nissan over. Defendants say more than a mile; the Montgomerys say just four blocks. [52] ¶ 23. A jury might well credit Jannifer's account, and the Court is not willing to find as a matter of law that a four-block delay in stopping on Lake Shore Drive, from a car starting in the middle lane during typical midday traffic, is enough, standing alone, to supply officers with reasonable suspicion to believe that someone in the vehicle is armed or dangerous. Defendants supply no case law to squarely support that proposition.[4] And a jury might well credit Jannifer's testimony that there was no safe place to stop before the off-ramp where this incident took place. [41-3] at 53:17–23. Whether Gubricky's subjective belief of danger was objectively reasonable is therefore a question for jurors.

---

[4] Defendants do cite *Smith v. City of Chicago*, 242 F.3d 737 (7th Cir. 2001). But, like *McNair*, the facts of *Smith* are meaningfully different. In *Smith*, the Seventh Circuit concluded that "a reasonable officer would have thought Smith was trying to flee" after he committed a traffic violation, continued driving for 12 blocks after police signaled him to pull over, and "did not stop … until marked police cars pulled in front of him." *Id.* at 740, 744. Not only is that a longer distance than what even defendants allege the Montgomerys drove before stopping—one mile is about eight standard Chicago blocks—but Jannifer Montgomery pulled over without the need for additional police intervention. Also, in *Smith*, there is no indication that officers drew their guns. *Id.* at 744.

12

Thus, viewing the facts in the light most favorable to the Montgomerys, a jury could reasonably conclude that officers Gubricky and Anderson pointed guns at the Montgomerys' Nissan and handcuffed the adult Montgomerys with no reason to suspect they had done anything unlawful other than drive with an expired registration. Under those circumstances, handcuffing and gun pointing would be disproportionate "to the threat posed." *Abbott*, 705 F.3d at 729.

### b. Qualified Immunity

Defendants argue that even if Gubricky's and Anderson's use of force against the Montgomerys were unreasonable, the two officers are protected by qualified immunity. The doctrine of qualified immunity protects police officers where their conduct does not violate the clearly established rights of which a reasonable officer would have known. *Baird*, 576 F.3d at 344 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine does not apply here because the Montgomerys had a clearly established right to be free from having a firearm pointed at them when they presented "no hint of danger" to the officers who stopped them. *Id.* at 347.

Defendants argue that there was a "hint of danger" here—Gubricky and Anderson knew there had been a shooting earlier. But as already discussed, taking the facts in the light most favorable to the Montgomerys, a jury could reasonably conclude that there had been no hint of danger from the Montgomerys themselves, where their Nissan did not come close to matching any description given by the dispatcher and the Montgomerys stopped at the first available exit from Lake Shore Drive after Gubricky engaged his police vehicle's lights. As also discussed above, the stop itself was valid given Gubricky's reasonable belief the Nissan's registration was

13

expired, but drawing guns on a family during a traffic stop and handcuffing the parents, with no other indication of danger, would be unreasonable. *Id.*

Defendants argue that Anderson, a probationary officer, was not "obligated to cross-examine Gubricky," his field training officer, on why Gubricky thought the Montgomerys' grey sedan had been involved in the shooting. [40] at 11. But that argument does not explain why Anderson would not have heard the same dispatch reports regarding the suspect vehicle as Gubricky—including dispatch's statement "I don't recall reading anything like that" when Gubricky asked if "anybody [said] anything about a blue or grey Nissan." [53-1] at 12:9–15—and why Anderson could not make an independent analysis of the danger posed. Yes, officers are entitled to rely in good faith on the judgment of officers who they reasonably believe might have access to more information about a situation than they do. *See United States v. Dorosheff*, 110 F.4th 999, 1006 (7th Cir. 2024) ("[P]olice must often act swiftly in response to developing circumstances and cannot be expected to cross-examine their fellow officers about the information transmitted to them in an ongoing investigation.") (cleaned up). But this cannot entitle an officer to cede any independent judgment to another officer who possesses identical information.

Defendants also point to no authority supporting the idea that a CPD probationary officer is held to a laxer constitution standard. To the contrary, counsel for defendants has represented to the Court that, as a probationary officer, Anderson had "been through the academy," was "certified by the state as a police officer," and remained on probation only pursuant to a CPD policy and only until he accompanied

14

a more experienced officer, like Gubricky, on several ride-alongs. [66] at 7:9-25. Defendants' counsel further conceded that he was "not aware" of any cases suggesting that a probationary officer should be treated differently for purposes under the Fourth Amendment. *Id.* at 8:7. Nor has the Court located any.

## 2. Officers Monahan and Georgopalis

The parties agree that Monahan and Georgopalis came to assist Gubricky; were told they were conducting a "felony stop"; pointed their guns at the Nissan; and that Georgopalis ordered the adult Montgomerys out of their vehicle. [52] ¶¶ 40–45, 49–54.

As discussed above, a jury could reasonably conclude that Gubricky and Anderson used unreasonable—and therefore constitutionally excessive—force against the Montgomerys during the stop. But Monahan and Georgopalis were in a different situation—they were the backup, arriving later at the scene to "assist" Gubricky. [52] ¶¶ 40–41, 49. Even if they heard the same dispatch broadcast that Gubricky did, they could reasonably have believed that Gubricky, who arrived first, knew something they did not. They were therefore entitled to rely on Gubricky's conclusion that a felony stop was justified, even if that conclusion was not itself reasonable. *See Dorosheff*, 110 F.4th at 1006; *United States v. Nafzger*, 974 F.2d 906, 913 (7th Cir. 1992) ("If the officer issuing the flyer or bulletin concludes that the facts he is aware of authorize a stop or arrest and relays that conclusion to another officer, that officer may rely on the conclusion, regardless of whether he knows the supporting facts.").

15

Because Monahan and Georgopalis could reasonably believe that their use of force was lawful in light of the information they possessed—namely, that Gubricky, the officer who initiated and led the stop, was instructing them to perform a felony stop—their actions are protected by qualified immunity, even if Gubricky's are not. *See Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The excessive force claim against Monahan and Georgopalis is therefore dismissed.

### C. Unlawful Search

The Montgomerys claim that the officers unlawfully searched their car and patted them down during the arrest, in violation of the Fourth Amendment. At the threshold, the Montgomerys concede that Georgopalis did not search the Nissan. [52] ¶ 66. The Court also does not understand the Montgomerys to assert that Anderson searched the car, or that either Anderson or Georgopalis were involved in the pat-downs. Nor does the Court see any record evidence that Anderson searched the car or that Anderson or Georgopalis patted down anyone. So any unlawful search claim against Anderson or Georgopalis is dismissed.

That leaves officers Gubricky and Monahan.

#### 1. Vehicle Search

Warrantless searches are per se unreasonable, unless they fall into one of the "few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (cleaned up). Briefly looking through a car window is not a "search" for the purpose of the Fourth Amendment, *see United States v. Ware*, 914

16

F.2d 997, 1000 (7th Cir. 1990), so Gubricky's quick peek did not require either a warrant or a delineated exception to be lawful.

Monahan's physical intrusion into the Nissan, though brief, puts him on different constitutional grounds, and whether he conducted a Fourth Amendment search hinges on whether his intrusion was "for the purpose of obtaining information." *United States v. Jones*, 565 U.S. 400, 404 (2012). The parties dispute Monahan's purpose in entering the car, [52] ¶ 65; [65] at 10, so there is a genuine dispute of material fact regarding whether Monahan searched the vehicle.

Defendants argue that even if Monahan's actions were a search, that search falls under the so-called "automobile exception," which recognizes that warrantless searches of automobiles can be constitutional "if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010); [65] at 10–11. But, viewed in the light most favorable to the Montgomerys, it is not clear whether Monahan had probable cause to believe that the vehicle contained "contraband or evidence of a crime" when he entered the Nissan. By that time, the adult Montgomerys were out of the car and handcuffed and defendants were aware of the children in the back seat—indeed, defendants argue that Monahan was merely trying to turn on the Nissan's heater for the benefit of the youngest Montgomery child in the backseat. Monahan certainly had probable cause to believe that the vehicle registration was expired, but defendants do not explain what evidence of that crime might be found inside the vehicle, nor what contraband might be associated with it. Because defendants have not explained why there was

17

"a fair probability that contraband or evidence of a crime [would] be found" in the car, there was not probable cause for a search of the Nissan. *See United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). And Monahan is not entitled to qualified immunity for a search of the vehicle, as the constitutional requirement that police searches be supported by probable cause is clearly established. *See, e.g., id.*

Defendants' motion for summary judgment is therefore granted as to the unlawful search claim against Gubricky but denied as to Monahan.

### 2. *Pat Down of Jannifer and Michael Montgomery*

Likewise, there is a genuine dispute of material fact about whether the searches of Jannifer and Michael Montgomery's bodies complied with the Fourth Amendment. During a *Terry* stop, officers "may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'" *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013) (quoting *Arizona v. Johnson*, 555 U.S. 323, 323 (2009)).

As discussed above, viewed in the light most favorable to the Montgomerys, defendants have presented no facts that compel the conclusion that the officers conducting the pat-downs had any reasonable and particularized suspicion that either Jannifer or Michael Montgomery were involved in the earlier shooting or that their behavior during the stop gave any indication they might be armed or dangerous.

At the same time, government officials are only liable for their own constitutional misconduct under § 1983. *See Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). The parties agree that Jannifer Montgomery was patted-down by a non-

defendant officer, and body-cam video shows this to be the case. [52] ¶ 62; [41-10] at 13:51.20–13:52:30. Likewise, the body-cam video from another non-defendant officer shows that officer patting down Michael Montgomery. [41-11] 13:51-13:53. The Montgomerys do not indicate if any of the defendant officers were involved in the pat-downs, and the Court sees no record evidence indicating that any were. Because the Montgomerys have not presented any evidence that any of the named defendants were involved in the pat-downs, the pat-down claims against them are dismissed.

### D. The Montgomery Children's Claims

Defendants argue that any claims against the Montgomerys' children, then ages one and four, should be dismissed because they were not handcuffed, "there is no evidence that [the older child] was even aware that guns were pointed at the car," the younger child slept through the stop, and the stop itself was justified by the traffic violation. [40] at 14. But defendants have submitted multiple body-cam videos showing police officers pointing guns at the car—with the children in it—on a sunny day. A jury might reasonably conclude that either child had looked out the car window and seen police officers pointing guns at them. But it is also not clear why that would be necessary for their claims to survive—defendants do not cite any authority to support their argument that a plaintiff's in-the-moment awareness of the excessive force is an "element essential to their case." *Id.* (citing *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992)). The children's excessive-force claims therefore survive.

### E. The City of Chicago

Finally, defendants argue that the city is entitled to summary judgment on any indemnification claim if the underlying § 1983 claims against its employees fail. 745

ILCS 10/2-109. Since several of the Montgomerys' claims survive summary judgment, so too does the indemnity claim against the city.

## IV. Conclusion

Defendants' motion for summary judgment is granted as to the illegal-stop claim, the excessive-force claims against Georgopalis and Monahan, and the unlawful-search claim regarding the car (against Gubricky) and the pat-downs (against all defendants). Defendants' motion is denied as to the excessive-force claims against Gubricky and Anderson and the unlawful-search claim involving Monahan's entry into the Nissan.

ENTERED: 11/1/24

_____

Georgia N. Alexakis
United States District Judge